# IN THE COURT OF APPEALS OF IOWA

No. 19-0258
Filed April 17, 2019

**IN THE INTEREST OF I.R.,**
**Minor Child,**

**K.G., Mother,**
    Appellant,

**B.Y., Father,**
    Appellant.
_____

Appeal from the Iowa District Court for Polk County, Rachael E. Seymour, District Associate Judge.

A mother and father separately challenge the termination of their parental rights to their child. **AFFIRMED ON BOTH APPEALS.**

Kelsey Knight of Carr Law Firm, P.L.C., Des Moines, for appellant mother.

Meegan M. Keller, Altoona, for appellant father.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

John Jellineck of Juvenile Public Defender's Office, Des Moines, attorney and guardian ad litem for minor child.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

A mother and father separately appeal the termination of their parental rights.

**I.    Background Facts and Proceedings**

K.G. and B.Y. are the parents of I.R., born in November 2016. At the time of the child's birth, M.R. was believed to be the father of I.R. The child came to the attention of the Iowa Department of Human Services (DHS) in August 2017 after the child was brought to the hospital with significant head and arm bruising. The child was in M.R.'s care, and he claimed the child accidentally fell when he was in a different room. M.R. told DHS that after he dropped the mother off at school, he had returned to his home with the child. He left the child sleeping while strapped into a car seat on the floor of the living room while he went to use the restroom. After about five minutes, he noticed the child crawling toward him. He claimed the child, who was nine months old at that time, was able to undo the straps and leave the car seat without assistance. He then took the child back into the living room and returned to the restroom when he heard a loud thump. He told DHS that when he went to investigate, he found the child face down by a plant stand near the front door of the residence. Sometime later, when he was changing the child's diaper, he noticed the child was favoring one arm and there was bruising on the child's face. M.R. contacted the mother to report what had happened and, after the mother returned from school, they sought medical assistance.

Hospital staff did not find M.R.'s explanation consistent with the child's injuries and called DHS to investigate. After a preliminary investigation, DHS recommended the child be allowed to stay with the mother at her home. It was

determined M.R. would not be allowed to care for the child until DHS concluded its final investigation. Initially, the mother and M.R. cooperated with DHS. However, as the safety planning progressed, both became uncooperative. When DHS and the mother attempted to leave the hospital with the child, M.R. and M.R.'s father became involved and refused to allow them to leave with the child. This included grabbing the child's carrier and refusing to let go. The mother made no effort to stop M.R. and M.R.'s father. Instead, she argued they had a right to have the child. The situation escalated to the point that hospital security was called and, eventually, the police. The police ultimately conducted an emergency removal.

The following day, the State sought and the court granted the removal of the child from the mother's and M.R.'s care given the allegation of physical abuse against M.R., the mother's denial of the abuse, and her inability to demonstrate that she could keep the child safe in her care. The court transferred temporary custody of the child to DHS for foster-care placement and DHS provided supervised visitation. The child has remained in foster care since her removal. In September, DHS finished its investigation and returned a founded child-abuse assessment against M.R. for physical abuse. The court adjudicated the child in need of assistance (CINA) in October, and the child remained in DHS custody.

In February 2018, paternity testing ruled M.R. out as the child's biological father. M.R. stated he wished to remain in the child's life but stopped attending visitations within a month and stopped engaging in services. In March, the mother reported the relationship with M.R. was over. However in April, M.R. was arrested while in the mother's car. M.R. was in the possession of drugs at that time. Testing confirmed B.Y. to be the child's biological father. The father was incarcerated at

that time on pending criminal charges. He eventually pled guilty to identity theft, malicious prosecution, and forgery. The father was sentenced to five years in prison and remained incarcerated at the time of the termination hearing. He is not expected to be released until 2020.

During the permanency hearing, the court noted the mother's progress in obtaining housing and employment in addition to starting to take responsibility for her failure to believe M.R. physically abused the child. The court was informed that on multiple occasions the mother allowed the father to visit with the child through video streaming without DHS authorization or supervision. These calls occurred during the mother's visits supervised by family members and not by professional supervisors. The court found these interactions "did not place the child at risk for harm but called into question Mother's reported progress regarding increased protective capacity." The court also found the "Mother's decision to set up visits at a time she was not being professionally supervised indicated she knew contact should not occur without DHS permission."

DHS requested and the court granted the mother an extension for reunification, finding the child should be reunified with the mother provided she followed and met certain conditions to eliminate the need for removal. The conditions included participating in therapeutic services, maintaining housing, and demonstrating an appropriate protective capacity. The court continued the child's CINA adjudication and placement out of the home. In May 2018, the mother was allowed to transport the child unsupervised to and from their child-parent psychotherapy sessions.

The mother's visits progressed to semi-supervised until June, when DHS discovered the mother allowed the maternal grandfather to stay overnight at her apartment. At the beginning of a visitation at the mother's home, DHS found the maternal grandfather sleeping in the living room. The maternal grandfather is a known long-term methamphetamine user and had an open CINA case. Initially, the mother did not seem to understand why this was a safety concern for the child. Visitation reverted back to fully supervised. The mother was still allowed to transport the child to and from therapy sessions and parenting classes until she missed numerous supervised visits and appointments.

The State filed its petition for termination in October. The court held a combined permanency review and termination-of-parental-rights hearing over two days, November 6 and 27. The father's attorney moved to continue because she was unable to contact the father via phone to be present for the hearing since he remained incarcerated. The court denied the motion to continue but attempted to contact the father again before proceeding, which was unsuccessful. The court proceeded with the hearing. When the hearing reconvened on November 27, the father was again unavailable by phone. The father's attorney could not reach the father due to issues at the correctional facility. The court proceeded with the hearing. Attempts to contact the father during court recesses were unsuccessful.

On January 31, 2019, the court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(d) and (h) (2018). The court terminated the father's parental rights pursuant to paragraphs (e) and (h). Both parents appeal.

**II.     Analysis**

Review of termination-of-parental-rights proceedings is de novo.  *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018).  "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses."  *Id.* (quoting *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014)).  "Our primary concern is the best interests of the child."  *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006).

"[R]eview of termination of parental rights under Iowa Code chapter 232 is a three-step analysis."  *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016).  We must first determine if "any ground for termination under section 232.116(1) has been established."  *Id.*  If a "ground for termination has been established, then we determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights."  *Id.* at 219–20.  "Finally, if we do find that the statutory best-interest framework supports the termination of parental rights, we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights."  *Id.* at 220.

A.     Father's Petition

The father's only argument challenging the termination of his parental rights is that he was denied procedural due process under both the Iowa and United States Constitutions.  He argues that, due to his incarceration, he was unable to participate in the combined permanency review and termination hearing.  He contends the juvenile court deprived him of the right to confront witnesses, assist counsel, and testify.  He cites *In re M.D.*, 921 N.W.2d 229 (Iowa 2018) to support his argument.

The termination hearing in this case was held over the course of two days, November 6 and 27, 2018. At the conclusion of the hearing on November 27, the court considered the matter submitted and closed the record. On November 30, the supreme court filed its ruling in *M.D.*, which adopted new procedures a juvenile court must take to allow incarcerated parents to participate in termination-of-parental-rights hearings.[1] The father did not file any motions after the juvenile court closed the record, nor after the supreme court filed its opinion.

First, the supreme court did not make the procedure for incarcerated parents retroactive, but instead explicitly made it prospective. *See M.D.*, 921 N.W.2d at 237 ("[W]e conclude juvenile court judges must follow a different procedure *moving forward*." (emphasis added)). Further, the father's due process argument was neither raised in, nor decided by, the juvenile court. His argument is thus not preserved for our review. *See In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) ("[T]he general rule that appellate arguments must first be raised in the trial court applies to CINA and termination of parental rights cases."); *In re K.C.*, 660 N.W.2d 29, 38 (Iowa 2003) ("Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for

---

[1] Specifically, the court ruled a juvenile court:

> must give incarcerated parents the opportunity to participate by telephone in the entire hearing. Second, if the attorney representing the incarcerated parent is unable to obtain the cooperation of prison officials to make the incarcerated parent available for the entire hearing, the juvenile court must communicate with the prison officials to explain the importance of participation by the parent and the benefits of avoiding the alternative procedure. Finally, if the efforts of the juvenile court are unsuccessful in giving the parent an opportunity to participate in the entire hearing, the juvenile judge must follow the alternative procedure that gives the incarcerated parent the opportunity to review the record of the evidence presented by the state at the hearing before testifying.

*M.D.*, 921 N.W.2d at 237–38.

appeal."). Included in his due process argument is the father's claim the district court abused its discretion by failing to accommodate prison telephone participation. We review this claim for an abuse of discretion. *See M.D.*, 921 N.W.2d at 234. Because the requirements of *M.D.* postdated the hearing, we find the district court did not abuse its discretion. We accordingly affirm the termination of the father's parental rights.

B.    Mother's petition

1.    *Sufficiency of the evidence*

The mother claims there is insufficient evidence in the record to support termination of her parental rights. The mother's parental rights were terminated pursuant to Iowa Code section 232.116(1)(d) and (h). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *A.B.*, 815 N.W.2d at 774.

> Termination under paragraph (d) requires the State to show:
>
> (1) The court has previously adjudicated the child to be a [CINA] after finding the child to have been physically or sexually abused or neglected as the result of the acts or omissions of one or both parents, or the court has previously adjudicated a child who is a member of the same family to be a [CINA] after such a finding.
> (2) Subsequent to the [CINA] adjudication, the parents were offered or received services to correct the circumstance which led to the adjudication, and the circumstance continues to exist despite the offer or receipt of services.

Iowa Code § 232.116(1)(d). "Within chapter 232, 'physical abuse or neglect' and 'abuse or neglect' mean 'any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the child.'" *In re J.S.*, 846 N.W.2d 36, 41 (Iowa

2014) (quoting Iowa Code § 232.2(42)). A CINA adjudication pursuant to Iowa Code section 232.2(6)(b) "requires a determination that a 'parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.'" *Id.* "[A] CINA determination under section 232.2(6)(b) may lead to termination of parental rights under section 232.116(1)(d)." *Id.*

It is undisputed that the child was previously adjudicated CINA under section 232.2(6)(b) after the court found the child sustained nonaccidental physical injuries at the hands of M.R. In its CINA adjudication order, the juvenile court concluded "[p]lacement outside the parental home is necessary because . . . a return to the home would be contrary to the child's welfare because of the non-accidental physical injuries suffered by the child and the Mother's failure to act in a protective capacity."[2] The disputed issue is whether the circumstances that led to the CINA adjudication continued to exist despite the offer of services.[3]

The mother contends that she participated meaningfully in numerous services, including parenting classes, individual therapy, and child-parent psychotherapy. She argues that the testimony of several witnesses at the termination hearing provided evidence that she has progressed well and gained insight into the issues related to the case. She also claims that the court misinterpreted her testimony regarding the physical abuse suffered by the child, which suggested she did not believe M.R. had physically harmed the child.

---

[2] The juvenile court incorporated its findings of fact from the removal hearing into the CINA adjudication order to support adjudication on the alleged grounds.

[3] The mother does not challenge the fact that the physical abuse was perpetrated by a member of the household other than a parent.

The child was removed from the mother's care due to the mother's failure to act in a protective capacity. While the mother had made progress in her treatment and seemed to be able to verbalize what healthy boundaries and relationships consist of, she has not been able to manifest that in her actions. She admitted she is learning but is not yet able to decide who are safe and appropriate people to allow to be around the child. She remained in a relationship with M.R. even after the child's removal despite evidence of M.R.'s physical abuse of the child. She also allowed him to use her vehicle in which he was arrested for drug possession.

Through the testimony of several witnesses at the termination hearing, it was clear the mother failed to notify both DHS and her therapists of her continued and unhealthy relationships with the maternal grandfather and the father. She failed to inform DHS that she allowed the maternal grandfather, a known drug user, to stay overnight at her home in violation of DHS directives and the juvenile court's orders. She also admitted she is unable to recognize when he is and is not on drugs. The mother also failed to inform DHS that she allowed the father to video conference with the child while he was incarcerated. The mother failed to recognize that this type of introduction to the father could be confusing and stressful to the child. Further, the mother told her therapist that she was not in contact with the child's father; however, between May and October 2018, they called each other over 100 times.

Finally, the juvenile court granted the mother a six-month extension in May, and she has failed to meet the conditions set forth by the court for the child to be returned to her care. These conditions included "demonstrating insight as to those

persons she associates with and mak[ing] appropriate decisions which show an appropriate protective capacity" and "keep[ing] DHS informed of any person she is allowing to be around the child." Upon our de novo review, we find there is clear and convincing evidence that the circumstances which led to the child's adjudication continue to exist despite the services that were offered and received by the mother. Accordingly, we affirm termination of the mother's parental rights pursuant to section 232.116(1)(d).

### 2. *Best interests and statutory exceptions to termination*

We must next consider whether termination is in the child's best interests. The mother argues that termination is not in the child's best interests because there is a very strong bond between herself and the child. In making best-interests determinations, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). "Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" *A.B.*, 815 N.W.2d at 778 (quoting *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000)).

As identified above, though the mother has made progress in her treatment, she continues to act and make decisions that raise considerable concerns about her protective capacity. Upon our de novo review, we find the child's best interests are served by the termination of the mother's parental rights.

To the extent the mother is arguing that a statutory exception to termination applies, it is the mother's burden to show the provision applies. *See A.S.*, 906 N.W.2d at 476 ("[T]he parent resisting termination bears the burden to establish an exception to termination."). "The court need not terminate the relationship between the parent and child if . . . [t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). The application of a statutory exception to termination under section 232.116(3) is "permissive not mandatory." *M.W.*, 876 N.W.2d at 225 (quoting *A.M.*, 843 N.W.2d at 113). "We may use our discretion, 'based on the unique circumstances of each case and the best interests of the child, whether to apply the factors in this section to save the parent-child relationship.'" *Id.* (quoting *A.M.*, 843 N.W.2d at 113). On our de novo review, we find that though there is a bond between the mother and child, the record does not reflect that the bond outweighs the child's need for permanency and stability. We decline to apply an exception to termination and therefore affirm the termination of the mother's parental rights.

**AFFIRMED ON BOTH APPEALS.**